William and Misty Lane
21567 N 85th Dr.
Peoria, AZ 85382
P: 623-451-1035 F: 903.716.5158

✓ FILED       ___ LODGED
___ RECEIVED  ___ COPY

SEP 0 4 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

## UNITED STATES DISTRICT COURT
### FOR DISTRICT OF ARIZONA

WILLIAM B. LANE & MISTY LANE,

        Plaintiff,

vs.

ROCKET MORTGAGE ET AL.,

        Defendant

Case No.: **2:24-cv-02798-SPL**

**PLAINTIFFS SECOND AMENDED COMPLAINT JURY TRIAL DEMAND**

## I.    INTRODUCTION

1. Plaintiffs bring this action against Rocket Mortgage, LLC ("Defendant") for its role in clouding Plaintiffs' title, recording false documents, and misrepresenting its ownership of Plaintiffs' April 10, 2024 mortgage loan despite having sold that loans payment stream into the Ginnie Mae REMIC Trust 2024-077 on May 30, 2024. (*Exhibit F & G*)

2. Defendants misconduct constitutes fraud, negligent misrepresentation, slander of title, breach of contract, breach of fiduciary duty, violations of Truth in Lending Act ("TILA"), and Fair Debt Collection Practices Act ("FDCPA"), violations of Arizona's Consumer Fraud Act, Quiet Title, recording of false documents, and entitles Plaintiffs to equitable accounting.

## II.    JURISDICTION AND VENUE

3. Jurisdiction is proper under 28 U.S.C. §1331 because Plaintiffs assert claims under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1641, and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692.

PLAINTIFFS SECOND AMENDED COMPLAINT JURY TRIAL DEMAND - 1

4. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for Plaintiffs' related Arizona statutory and common law claims.

5. Venue is proper under 28 U.S.C. §1391(b) because the property at issue is in Maricopa County, Arizona, and Defendant transacts business in the District.

## III.    PARTIES

6. Plaintiffs William B. Lane and Misty S. Lane in Maricopa County and are owners of the property at 21567 N. 85th Dr., Peoria, Arizona 85382.

7. Defendant Rocket Mortgage, LLC f/k/a Quicken Loans, LLC, is a Delaware limited liability company with its principal place of business in Detroit Michigan, registered to do business in Arizona.

## IV.    FACTUAL ALLEGATIONS

8. On April 10, 2024, Plaintiffs executed a Promissory Note in the amount of $715,000 payable to Rocket Mortgage, LLC, secured by a Deed of Trust recorded on April 15, 2024 as Instrument No. 20240192846 in Maricopa County. (*Exhibit A*)

9. The Note remains unendorsed; no endorsement appears on its face or on an allonge. Under A.R.S. §§ 47-3203 and 47-7501, negotiation requires endorsement and delivery. Without endorsement, Rocket Mortgage could not transfer enforcement rights. (*Exhibit A*)

10. On May 30, 2024, Defendant sold the intangible payment stream from Plaintiffs' loan into the Guaranteed REMIC Pass Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 ("GNMA 2024-077 Trust"). Public records and loan-level data confirm Loan No. 3541722640 was included in Group 4 of the Trust, with Rocket Mortgage identified as both Seller and Servicer. (*Exhibit E*)

11. Despite that sale, no assignment of the Deed of Trust to GNMA 2024-077 Trust was ever recorded in Maricopa County as required by A.R.S. § 33-411.

12. On September 9, 2024, Defendant caused to be recorded a document titled "Assignment of Deed of Trust," Instrument No. 20240477565, signed by MERS as "assignor" to Rocket Mortgage. This assignment was false, because Rocket Mortgage had already divested beneficial ownership of the debt by transferring it into GNMA 2024-077. (*Exhibit C*)

13. Defendant failed to provide Plaintiffs written notice of this transfer within thirty (30) days, as required by 15 U.S.C. § 1641(g).

14. Defendant has since continued to represent itself as the secured creditor of Plaintiffs' loan, even though the debt obligation belongs to GNMA 2024-077. (*Exhibit C*)

15. These actions have clouded Plaintiffs' title, created uncertainty as to the true creditor, and damaged Plaintiffs by impairing marketability of their property, exposing them to wrongful collection activity, and forcing them to incur fees, including late fees, collection fees, attorney fees and more.

## V.    CLAIMS FOR RELIEF

**COUNT 1- SLANDER OF TITLE (Arizona Common Law)**

16. Defendant recorded a false Assignment of Deed of Trust (September 9, 2024, Instrument No. 20240477565).

17. At the time of recording, Defendant knew or should have known the instrument was false because the loan had already been securitized into GNMA 2024-077.

18. Recording a knowingly false claim of interest against real property constitutes slander of title under Arizona law.

19. Plaintiffs have suffered damages including impairment or title and litigation costs as a direct and proximate result.

**COUNT II- FRAUD (Arizona Common Law)**

20. Defendant represented in public records and correspondence that it was the owner/beneficiary of Plaintiffs' loan after May 2024.

21. This representation was false: Rocket Mortgage had already transferred ownership to GNMA 2024-077.

22. Defendant made these statements knowingly or with reckless disregard for the truth, intending Plaintiffs to rely on them.

23. Plaintiffs relied by treating Rocket Mortgage as a creditor and expending resources to investigate.

24. Fraud requires misrepresentation, scienter, intent, reliance, and damages, all pled here with specifics.

**COUNT III- NEGLIGENT MISREPRESENTATION (Arizona Common Law)**

25. In the alternative, Defendant supplied false information in its recorded Assignment and in representing itself as creditor.

26. Defendant failed to exercise reasonable care in ensuring accuracy.

27. Plaintiffs justifiably relied and were harmed. Arizona recognizes negligent misrepresentation where false information is supplied in the course of business.

**COUNT IV- BREACH OF CONTRACT (Arizona Law)**

28. The Deed of Trust (April 10, 2024) is a valid contract.

29. Paragraph 16 requires compliance with "Applicable Law."

PLAINTIFFS SECOND AMENDED COMPLAINT JURY TRIAL DEMAND - 4

30. Defendant breached by failing to record lawful assignments (A.R.S. § 33-411) and failing to comply with TILA § 1641(g).

31. Plaintiffs were damaged by clouded title and uncertainty as to the true creditor as a direct and proximate result of Rocket Mortgage's actions.

**COUNT V- BREACH OF FIDUCIARY DUTY/DUTY OF GOOD FAITH AND FAIR DEALING**

32. Arizona law implies a duty of good faith in every contract.

33. Defendant breached this duty by concealing the loan's transfer and recording false instruments to maintain control.

34. Plaintiffs were harmed as a direct and proximate result by Defendant's bad faith conduct.

**COUNT VI- TRUTH IN LENDING ACT (15 U.S.C. § 1641(g))**

35. On May 30, 2024, the loan was transferred to GNMA 2024-077 Trust. (*Exhibit B & C*)

36. Defendant failed to notify Plaintiffs in writing within 30 days.

37. Failure to give this notice violates § 1641(g) and creates a private right of action.

38. Plaintiffs seek statutory and actual damages.

**COUNT VII- FAIR DEBT COLLECTION PRACTICES ACT (15 U.S.C. §§ 1692e, 1692f(6))**

39. After selling the debt, Defendants acted as a servicer but falsely represented itself as the owner and beneficiary.

40. Section 1692e prohibits false representations of a debts status; § 1692f(6) prohibits threatening foreclosure without a present right to possession.

41. By recording the false assignment and asserting ownership, Defendant violated both.

## COUNT VIII- ARIZONA CONSUMER FRAUD ACT (A.R.S. § 44-1522)

42. Defendant engaged in deceptive practices by misrepresenting its ownership of Plaintiffs' loan and recording a knowingly false assignment.

43. These acts occurred in the conduct of commerce and caused Plaintiffs ascertainable damages.

## COUNT IX- QUIET TITLE (A.R.S. § 12-1101)

44. Plaintiffs are the lawful owners of the property.

45. Defendant claims an adverse interest through the false September 9, 2024 Assignment.

46. Plaintiffs seek a judgement declaring Defendant has no valid lien or beneficial interest and quieting title in Plaintiffs name.

## COUNT X- EQUITABLE ACCOUNTING

47. Plaintiffs are entitled to a full accounting of all transactions, transfers, and securitization proceeds related to the loan.

48. Defendant is in possession of this information, which is necessary for Plaintiffs to protect their rights.

## COUNT XI- RECORDING FALSE DOCUMENTS (A.R.S. § 39-161)

49. Defendant knowingly caused to be recorded the September 9, 2024 Assignment, a false instrument.

50. A.R.S. 0167 39-161 prohibits knowingly recording false or forged documents affecting real property.

51. Plaintiffs are entitled to relief including damages and cancellation of the false assignment.

### VI.    PRAYER FOR RELIEF

PLAINTIFFS SECOND AMENDED COMPLAINT JURY TRIAL DEMAND - 6

Plaintiffs respectfully request that this Court:

    a.  Declare Rocket Mortgage has no valid lien or beneficial interest.

    b.  Quiet title in Plaintiffs' favor

    c.  Award compensatory damages for fraud, misrepresentation, slander of title, and breach of contract

    d.  Award statutory damages under TILA and FDCPA

    e.  Award treble damages under the Arizona Consumer Fraud Act

    f.  Order an equitable accounting

    g.  Award attorney's fees and costs under 15 U.S.C. § 1640(a)(3), A.R.S. § 12-341.01, and applicable law.

    h.  Grant such other relief as this Court deems just.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by Jury on all issues so triable.

Dated this 4th day of September, 2025

_Misty S. Lane_
Misty S. Lane

_William B. Lane_
William B. Lane

PLAINTIFFS SECOND AMENDED COMPLAINT JURY TRIAL DEMAND - 7

1

## CERTIFICATE OF SERVICE

2

3   I hereby certify that on this 4th day of September 2025 I caused a true and correct copy of the foregoing Second Amended Complaint with Jury Demand to be served upon Defendant by filing in person with the Court Clerk and emailing counsel of record.

4

5   SPENCER FANE LLP
    David E. Funkhouser III (No. 022449)
6   Dina G. Aouad (No. 036249)
    2415 E. Camelback Road, Suite 600
7   Phoenix, Arizona 85016
    Telephone: (602) 333-5430
8   Facsimile: (602) 333-5431
    dfunkhouser@spencerfane.com
9   daouad@spencerfane.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS SECOND AMENDED COMPLAINT JURY TRIAL DEMAND - 8

REPORT REQUESTED BY:
William and Misty Lane
21567 N. 85th Dr.
Peoria, AZ 85382

## AFFIDAVIT OF JOSEPH R. ESQUIVEL JR.

I, Joseph R. Esquivel Jr, declare as follows:

1.  I am over the age of 18 years and qualified to make this Affidavit.

2.  I am a licensed private investigator in the State of Texas, License # A20449.

3.  I make this Affidavit based on my own personal knowledge.

4.  I make this Affidavit in support of Mortgage Compliance Investigations Chain of Title Analysis & Mortgage Fraud Investigation requested by William and Misty Lane regarding the Loan Instruments and the associated real property located at 21567 N. 85th Dr, Peoria, AZ 85382 as referenced in the Maricopa County Record.

5.  I have no direct or indirect interest in the outcome of the case at bar for which I am offering my observations.

6.  I have personal knowledge and experience in the topic areas related to the securitization of mortgage loans, real property law, Uniform Commercial Code practices, predatory lending practices, assignment and assumption of securitized loans, creation of trusts under deeds of trust, pooling and servicing agreements, issuance of asset-backed securities and specifically mortgage-backed securities by special purpose vehicles in which an entity is named as trustee for holders of certificates of mortgage backed securities, the foreclosure process of securitized and non-securitized residential mortgages in both judicial and non-judicial states, and the various forms of foreclosure-related fraud.

7.  I perform my research through the viewing of loan level data and Corporate/Trust Documents that have been obtained by Housing Mortgage Consultants (William McCaffrey). I then analyze the information for the purpose of the investigation.

8.  I have the training, knowledge and experience to perform these searches and understand the meaning of these records and documents with very reliable accuracy.

---

1  9. I am available for court appearances, in person or via telephone for further clarification or
2     explanation of the information provided herein, or for cross examination if necessary.

3  10. Mr. McCaffrey of Housing Mortgage Consultants is also available for court appearances, in
4     person or via telephone, for further clarification or explanation of the information provided
5     herein, or for cross examination if necessary.

6  11. I have been hired by William and Misty Lane to investigate and review documents pertaining to
7     the property located at 21567 N. 85th Dr, Peoria, AZ 85382. These documents have been obtained
8     from the Maricopa County Recorder's Office and from Rocket Mortgage LLC. Those documents
      are as follows:

9
10
11

| Exhibit | Document Name | Date Recorded into the Public Records | Document Number |
|---|---|---|---|
| A | Note Received from Rocket Mortgage LLC on or about May | - Not Recorded - | 3541722640 |
| B | Deed of Trust | April 15, 2024 | 20240192846 |
| C | Assignment of Deed of Trust | September 09, 2024 | 20240477565 |
| D | MERS Procedures Manual Page 63 and MERS KIT Pages | -Not Recorded- | |
| E | Pages – 1-9 of Offering Circular Supplement Ginnie Mae REMIC Trust 2024-77 | -Not Recorded- | |

15
16 12. On August 26, 2025, the William B. Lane and Misty S. Lane payment stream (The Debt) was
17    identified in the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae
18    REMIC Trust 2024-077 ("GNMA 2024-077 Trust") This trust is a Special Purpose Vehicle
      (SPV) which was created for the purpose of issuing mortgage-backed securities.
19
20 13. The returns that are paid on the mortgage-backed securities are derived from "slices"
21    ("tranches") of the pool of comingled payments. "Pooling" (commingling) these trust assets to
22    back financial instruments purportedly serve as the foundation for the instruments (as
      "securities") being offered and sold to secondary-market investors, in the process known as
23    "securitization."
24
25 14. The information contained herein was derived by research through professional services, and by
26    reviewing the Loan Level Data obtained from the Ginnie Mae Enterprise Online Portal on
27    August 26, 2025, by independent third-party securitization and banking expert, William
      McCaffrey (Housing Mortgage Consultants Inc.), who specializes in locating Residential
28

Affidavit of Joseph R. Esquivel, Jr. for – William and Misty Lane 21567 N. 85th Dr., Peoria, AZ 85382

Mortgage-Backed Securities, (RMBS), and VA, FHA and GSE loans. Several identifying loan indicators were researched, including the loan number for the William B. Lane and Misty S. Lane Loan (located on the Note, attached hereto as Exhibit "A," and on the Deed of Trust, attached as Exhibit "B").

15. Based on the research that I have conducted, the evidence shows that the William B. Lane and Misty S. Lane payment stream (The Debt) is currently in the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 as shown by the information below, as of August 26, 2025.

16. The Loan Level Data information for the William B. Lane and Misty S. Lane loan below was obtained from the Ginnie Mae Enterprise Online Portal by an independent third party who specializes in locating Residential Mortgage-Backed Securities, (RMBS), and VA, FHA and GSE loans (Housing Mortgage Consultants), William McCaffrey on August 26, 2025.

**Search Results:** – Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077

**Trust Closing date:** May 30, 2024
This is the last date in which assets may be placed into the trust

4|882705128|N|3541722640|RETAIL|ROCKET MORTGAGE LLC|ROCKET MORTGAGE LLC |6.490|6.490|6.875|000715000.00|000715000.00|360|06/2024|000|360|05/2054|95|95|689||NO|PU RCHASE|SF|

AZ|85382|PUD|FIXED||NO|4514.59|P|45-45-6-3377007||GINNIE MAE REMIC TRUST 2024-077

The information below was taken from above, put into a vertical column and the information was cross-indexed with the William B. Lane and Misty S. Lane Note and Deed of Trust to show the matching indicator information.

4 - This is the Group number that the Payment Stream (The debt) is located within the Trust Series
|882705128 - ID number for Trust
|N
|3541722640 - Corresponding loan number – **Matches Note and Deed of Trust**
|RETAIL - Classification of Loan – Retail, Wholesale or Corresponding

---

3

|ROCKET MORTGAGE LLC - Seller of Payment Stream (the Debt) to Government National Mortgage Association – **Matches Lender on Note and Deed of Trust**

|ROCKET MORTGAGE LLC - Current Servicer

|6.490 - the actual interest rate that the Payment Stream (the Debt) was purchased at

|6.490 - Original Interest Rate - **Matches Note**

|6.875 - Triad Coupon Rate

|000715000.00 - Original loan amount - **Matches Note and Deed of Trust**

|000715000.00 - Premium Price sold to Government National Mortgage Association

|360 - Length of Loan in months - **Matches Note**

|06/2024 - Date of First Payment for loan - **Matches Note**

|000

|360 - Loan Amortization at 360 Months

|05/2054 – Maturity Date- **Matches Note**

|95 - LTV

|95 - LCTV

|689 – FICO Score at time of signing

|

|NO - Refinance

|PURCHASE - (Type of Loan) vs Refinance

|SF – Single Family

|AZ – State Abbreviation - **Matches Note and Deed of Trust**

|85382 – Property Zip Code - **Matches Note and Deed of Trust**

|PUD - **Matches Deed of Trust**

|FIXED - Fixed Rate Mortgage vs. Adjustable-Rate Mortgage

|

|NO

|4514.59 – Monthly Payment - **Matches Note**

|P

|45-45-6-3377007 – Case # - **Matches Note and Deed of Trust**

|

|GINNIE MAE REMIC TRUST 2024-077 – Trust Series where the Payment Stream (The Debt) is located

4

Affidavit of Joseph R. Esquivel, Jr. for – William and Misty Lane 21567 N. 85th Dr., Peoria, AZ 85382

17. "Loan Level Data" refers to specific loan characteristics of the loan. Examples of different types of specific data types would be "Loan number," "Original Balance," "Maturity Date," "Property State," "Property Zip Code," "Property City," "Pool Number," and many more. Depending on the information that was available when the information was inputted and entered into the data platform, some loans would have more data available, and others would have less.

18. Securitization is the process of "aggregating" (i.e., commingling) the payments from a large number of mortgage loans into what is called a "mortgage pool" and then selling "shares" (called "certificates") to investors, who then receive "returns" over a specific time period. The "pool" of commingled mortgage payments is "sliced" into "tranches" from which many different "classes" of investments (with varying rates of "returns") are created, and subsequently offered for sale by way of a "prospectus." Based on this information, William B. Lane and Misty S. Lane's mortgage payments ultimately flowed to and/or through the "pool" created by or on behalf of the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 Trust. However, in my opinion, it is impossible to determine the exact amounts from any mortgage payment paid out to any specific investor, as this was done *after* William B. Lane and Misty S. Lane's payments were commingled with other monies.

19. The indicators pertaining to the William B. Lane and Misty S. Lane loan show that the payment stream (The Debt) was securitized, however it was not done properly; and that Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 paid value for the  William B. Lane and Misty S. Lane payment stream (The Debt)  which was the right to collect future payments for the William B. Lane and Misty S. Lane mortgage loan.

20. Residential mortgage-backed securities, or RMBS, are bonds or notes created by securitization that are backed by residential mortgages or residential real estate loans. RMBS originators are typically financial institutions that originate residential real estate or residential mortgage loans, including banks, building societies/savings & loans and mortgage finance companies. However, issuers could also include government-guaranteed securities issued following bank bailouts, such as TARP or TALF, and the Government Sponsored Enterprises Fannie Mae and Freddie Mac.

21. To create residential mortgage-backed securities, or RMBS, institutions sell pools of their loans to a special-purpose vehicle, or SPV, which then sells the loans to a trust. The trust then repackages the loans as interest-bearing securities and issues them. This true sale of the loans to

5

1    the SPV ensures that the RMBS is treated as bankruptcy-remote from the originator.

2    22. These trust entities are REMIC'S in which the IRS describes a (Real Estate Mortgage Investment
3    Conduit) REMIC as an entity formed for the purpose of holding a fixed pool of mortgages secured
4    by interests in real property (IRS Publication 550, Investment Income and Expenses, 2015)

5    23. Without these transactions going through the proper parties, valid transactions can not take place
6    and that would leave the trust without having properly secured assets for the certificate holders.

7    24. I have examined the most current copy of the William B. Lane and Misty S. Lane Promissory
8    Note (which was obtained by the borrowers from Rocket Mortgage, LLC  the current "servicer"
9    of the loan, on or about May 2025); the William B. Lane and Misty S. Lane Deed of Trust; and
10    the entire purported "chain of assignments" of the William B. Lane and Misty S. Lane Deed of
11    Trust, and have found that Guaranteed REMIC Pass-Through Securities and MX Securities
12    Ginnie Mae REMIC Trust 2024-077 Trust is not named in any manner on any of the instruments
13    (See Exhibits "A" thru "C" attached within).

14    25. I have examined a purported to be true and correct copy of a Promissory Note of William B. Lane
15    and Misty S. Lane dated April 10, 2024, regarding a loan for $715,000.00. The Original Lender
16    of the April 10, 2024, Lane loan is Rocket Mortgage, LLC. (See Exhibit "A" attached within).

17        a.    This copy of the William B. Lane and Misty S. Lane Note shows no
18              endorsements to the Note attempting to make the Note payable to anyone.

19    26. The Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust
20    2024-077 are not named in any way on the William B. Lane and Misty S. Lane Note.

21        a.  U.S. Bank National Association as Trustee for the Guaranteed REMIC Pass-Through
22            Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 not in its Individual
23            Capacity but solely as Trustee for Guaranteed REMIC Pass-Through Securities and MX
24            Securities Ginnie Mae REMIC Trust 2024-077 is not named or referenced in any way on
             the William B. Lane and Misty S. Lane Note.
25
26        b.  The Government National Mortgage Association as Guarantor for the Guaranteed
27            REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077
             not in its Individual Capacity but solely as Guarantor for Guaranteed REMIC Pass-
28

Affidavit of Joseph R. Esquivel, Jr. for – William and Misty Lane 21567 N. 85th Dr., Peoria, AZ 85382

Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 is not named or referenced in any way on the William B. Lane and Misty S. Lane Note.

27. There is no evidence that Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 ever received an ownership interest in the William B. Lane and Misty S. Lane Note.

28. Endorsement is mechanically necessary to constitute transfer interest to party not originally named. Entitlement to enforce a note focuses on the relationship between the maker of the note and the person enforcing it. Ownership of the note is a concept that deals with who is entitled to the economic fruits of the note.

29. The compounding misunderstanding that keeps recurring concerns the difference between enforcement of the Note and enforcement of the Deed of Trust. Someone may be able to enforce the Note without owning the debt, but nobody can enforce the Deed of Trust without owning the debt. Through the acts of the transferors and transferees of the Note and the Deed of Trust, rights to the Deed of Trust can be separated from rights to the Note, causing the debt to be no longer secured by title to real property.

30. Without ownership of the debt, ownership of the note still evidencing the debt and ownership of the Deed of Trust as a lien to enforce the debt, there is no retention of the right to enforce the Deed of Trust as a properly secured lien.

31. I have examined a Deed of Trust of William B. Lane and Misty S. Lane dated April 10, 2024, and filed in the Official Records of the Maricopa County Recorder's Office on April 15, 2024, as ins# 20240192846 (See Exhibit "B" attached within).

    a. The **Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077** are not named in any way to the William B. Lane and Misty S. Lane Deed of Trust

    b. U.S. Bank National Association as Trustee for the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 not in its Individual Capacity but solely as Trustee for Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 is not named or referenced in any

way on the William B. Lane and Misty S. Lane Deed of Trust

c.  The Government National Mortgage Association as Guarantor for the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 not in its Individual Capacity but solely as Guarantor for Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 is not named or referenced in any way on the William B. Lane and Misty S. Lane Deed of Trust

32. I have examined the Maricopa County Record relating to the William B. Lane and Misty S. Lane Deed of Trust dated April 10, 2024. The Maricopa County Record shows an "Assignment of Deed of Trust", dated September 05, 2024 and filed in the Official Records of the Maricopa County Recorder's Office on September 09, 2024 as ins# 20240477565, signed by Amy Colvin as Vice President for Mortgage Electronic Registration Systems, Inc., and notarized September 05, 2024 by Katie Olson, Idaho Notary Commission #20210709, where Mortgage Electronic Registration Systems, Inc., grants, assigns, and transfers to Rocket Mortgage, LLC, FKA Quicken Loans, LLC (See Exhibit "C" attached within).

33. There is no sale of the William B. Lane and Misty S. Lane Mortgage Loan caused through the William B. Lane and Misty S. Lane Assignment of Deed of Trust.

34. I have examined a copy of the MERS Procedures Manual, Release 19.0, dated June 14, 2010, and MERS Residential Marketing Kit, Terms And Conditions: (See Exhibit "D"" attached within)

a.  It is stated in the MERS Procedures Manual, Release 19.0, dated June 14, 2010:

Page 63 – Transfer of Beneficial Rights to Member Investors, Overview:

**"Although MERS tracks changes in ownership of the beneficial rights for loans registered on the MERS System, MERS cannot transfer the beneficial rights to the debt. The debt can only be transferred by properly endorsing the promissory note to the transferee."** (emphasis added)

It is stated in the MERS Residential Marketing Kit, Terms And Conditions:

2. …MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. **MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights**

8

1    **related to such mortgage loans, or to any mortgaged properties securing such**
     **mortgage loans.  MERS agrees not to assert any rights** (other than rights
2    specified in the Governing Documents) with respect to such mortgage loans or
3    mortgaged properties.  References herein to "mortgage(s)" and "mortgagee of
     record" shall include deed(s) of trust and beneficiary under a deed of trust and any
4    other form of security instrument under applicable state law. (emphasis added)

5    6. **MERS and the Member agree that:  (i) the MERS System is not a vehicle for**
     **creating or transferring beneficial interests in mortgage loans**… (emphasis
6    added)

7
8    35. It is my professional observation, there was no "true sale" of the William B. Lane and Misty S.
9        Lane Mortgage Loan caused through the William B. Lane and Misty S. Lane Assignment of Deed
         of Trust.

10
11   36. Based on my examination of the William B. Lane and Misty S. Lane loan instruments, and all
12       available documents recorded in the Maricopa County records associated therewith, there is no
13       evidence or indication that Guaranteed REMIC Pass-Through Securities and MX Securities
14       Ginnie Mae REMIC Trust 2024-077 ever acquired ownership rights to the William B. Lane and
15       Misty S. Lane loan, note, Deed of Trust, the debt purportedly 'evidenced' thereby, and/or the real
         property purportedly 'secured' thereby.

16   37. Based on my examination, as Guaranteed REMIC Pass-Through Securities and MX Securities
17       Ginnie Mae REMIC Trust 2024-077 has never acquired rights to the William B. Lane and Misty
18       S. Lane Note and Deed of Trust, those rights can not be transferred to another party. Historically
19       an Assignment of the Deed of Trust without an assignment of the debt creates no right in the
20       assignee.

21   38. In my professional observation, all the available evidence that I have examined lacks proof, or
22       even a showing, of any proper transfer of the debt obligation (purportedly evidenced by the note)
23       along with proper transfer of collateral rights in the real property (purportedly evidenced by the
24       Deed of Trust).  In fact, there is no evidence that suggests the William B. Lane and Misty S. Lane
25       Note was properly transferred simultaneously with any purported transfer of the beneficial rights
         in the William B. Lane and Misty S. Lane Deed of Trust.
26
27   39. The transfer and sale of all Beneficial Interest of the William B. Lane and Misty S. Lane Deed
28       of Trust to Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae

                                            9

Affidavit of Joseph R. Esquivel, Jr. for – William and Misty Lane 21567 N. 85th Dr., Peoria, AZ 85382

REMIC Trust 2024-077 should have been done on or before the Closing Date of the Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077 which was May 30, 2024, (See Exhibit "E" attached within).

The above statements are affirmed by me under penalty of perjury under the laws of the State of Texas to be true and correct to the best of my knowledge and belief, are based on my own personal knowledge, and I am competent to make these statements.

FURTHER THE AFFIANT SAYETH NAUGHT

By _____

Joseph R Esquivel, Jr.
Private Investigator License # A20449
Mortgage Compliance Investigations LLC

STATE OF TEXAS        )
                      )
COUNTY OF TRAVIS      )

Subscribed and sworn before me, _Lori M. Esquivel_, Notary Public, on this _29th_ day of _August_, 2025 by Joseph R Esquivel, Jr proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal.

LORI M. ESQUIVEL
ID #130167889
My Commission Expires
March 25, 2027

_Lori M. Esquiue_
Notary Public

Affidavit of Joseph R. Esquivel, Jr. for — William and Misty Lane 21567 N. 85th Dr., Peoria, AZ 85382

# EXHIBIT "A"

NOTE

Lane
Loan #: 3541722640
MIN: 100039035417226403
Case #: 45-45-6-3377007

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

April 10, 2024        Peoria,            Arizona
[Note Date]             [City]                 [State]

21567 N 85th Dr, Peoria, AZ 85382-3413
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan in the amount of U.S. $715,000.00 (the "Principal") that I have received from Rocket Mortgage, LLC (the "Lender"), I promise to pay the Principal, plus interest, to the order of the Lender. I will make all payments under this Note in U.S. currency in the form of cash, check, money order, or other payment method accepted by Lender.

• I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid Principal until the full amount of the Principal has been paid. I will pay interest at a yearly rate of 6.490%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month. This amount is called my "Monthly Payment."

I will make my Monthly Payment on the first day of each month beginning on June 1, 2024. I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each Monthly Payment will be applied as of its scheduled due date and will be applied to interest before the Principal. If, on May 1, 2054, I still owe amounts under this Note, I will pay those amounts on that date, which is called the "Maturity Date."

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3200  07/2021
Modified for VA
Page 1 of 5

EX 25961.5



Q1035417226400020200014082b61a23-e7b7-4f74-9349-9d3f77516d400105

3541722640

I will make my Monthly Payments at **P.O. Box 6577, Carol Stream, IL 60197** or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My Monthly Payment will be in the amount of U.S. $4,514.59. This payment amount does not include any property taxes, insurance, or other charges that I may be required to pay each month.

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will notify the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the Monthly Payments then due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. A partial Prepayment must be in an amount not less than the next monthly principal payment or $100, whichever is less. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. A full Prepayment will be credited on the date received by the Note Holder and no interest will be charged after that date. A partial Prepayment will be credited by the next payment due date or 30 days after the Prepayment is received by the Note Holder, whichever is earlier. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my Monthly Payment unless the Note Holder agrees in writing to those changes.

### 5. LOAN CHARGES

If applicable law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any Monthly Payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000% of my overdue installment (principal, interest, and escrow for taxes and insurance), unless such amount exceeds the maximum amount allowed by applicable state law, in which case the Lender may collect the maximum amount allowed by such law. I will pay this late charge promptly but only once on each late payment.

#### (B) Default

If I do not pay the full amount of each Monthly Payment on the date it is due, I will be in default.

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3200  07/2021
Modified for VA
Page 2 of 5

&#9635;  25961.5



Q1035417226400020200014082b61a23-e7b7-4f74-9349-9d3f7516d400205

3541722640

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of unpaid Principal, all the interest that I owe on that amount, and other charges due under this Note (the "Default Balance"). That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

If I am in default and the Note Holder does not require me to pay the Default Balance immediately as described above, the Note Holder will still have the right to do so if I continue to be in default or if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay the Default Balance immediately as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees and costs.

## 7. GIVING OF NOTICES

### (A) Notice to Borrower

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it, or by mailing it by first class mail, to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address. I will promptly notify the Note Holder of any change to my physical address and of any change to my mailing address. Unless applicable law requires otherwise, notice may instead be sent by e-mail or other electronic communication if agreed to by me and the Note Holder in writing and if I have provided the Note Holder with my current e-mail address or other electronic address. If I have agreed with the Note Holder that notice may be given by e-mail or other electronic communication, I will promptly notify the Note Holder of any changes to my e-mail address or other electronic address.

### (B) Notice to Note Holder

Any notice that I must give to the Note Holder under this Note will be delivered by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200  07/2021
Modified for VA
Page 3 of 5

25961.5



Q10354172264000202000140826861a23-e7b7-4f74-9349-9d3f77516d400305

3541722640

against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 9.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 10.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument also describes how and under what conditions I may be required to make immediate payment of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.



_William B. Lane_ 04/10/2024
- BORROWER - William  B.  Lane - DATE -

_Misty S. Lane_ 04/10/2024
- BORROWER - Misty  S.  Lane - DATE -

*[Sign Original Only]*

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3200  07/2021
Modified for VA
*Page 4 of 5*

EX  25961.5

Q1035417226400020200014082b61a23-e7b7-4f74-9349-9d3f77516d400405

3541722640

Individual Loan Originator: **Anthoine Wyatt,** NMLSR ID: **1510633**
Loan Originator Organization: **Rocket Mortgage, LLC,** NMLSR ID: **3030**

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130,
NMLS #: 1510633)

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3200  07/2021
Modified for VA
Page 5 of 5

25961.5


Q10354172264000202000014082b61a23-e7b7-4f74-9349-9d3f77516d400505

## ALLONGE TO PROMISSORY NOTE

FOR PURPOSE OR FURTHER INDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS
ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE:

LOAN NUMBER: 3541722640

NOTE DATE: April 10, 2024 (date note signed by borrowers)

ORIGINAL LOAN AMOUNT: $715,000.00

TOTAL PROMISSORY NOTE AMOUNT: $1,639,219.07

IN FAVOR OF: William Bonner Lane, Misty Sue Lane

BORROWER(S) NAME(S)/EXECUTED BY: William Bonner Lane, Misty Sue Lane

ADDRESS: 21567 N. 85th Drive
Peoria, Arizona 85382-3413

RESTRICTIVE INDORSEMENT
WITHOUT RECOURSE
PAY TO THE ORDER OF:
WILLIAM BONNER LANE
MISTY SUE LANE

By: _William - bonner lane_ 04/10/2024, Creditor
For: WILLIAM BONNER LANE/Principal

By: _Misty-Sue lau_ 04/10/2024 Creditor
For: MISTY SUE LANE/Principal

*Information (amounts) based on closing information issued by Rocket Mortgage submitted to buyers April 10, 2024

# EXHIBIT "B"

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
20240192846  04/15/2024  08:40
ELECTRONIC RECORDING

1713193539409-28-1-1--
Hoyp

After Recording Return To:
Rocket Mortgage, LLC
1050 Woodward Ave
Detroit, MI 48226-1906

Prepared By:
Mitchell Johansen
Rocket Mortgage, LLC
1050 Woodward Ave
Detroit, MI 48226-1906
(800) 226-6308

[Space Above This Line For Recording Data]

## RESIDENTIAL 1-4 DEED OF TRUST

Lane
Loan #: 3541722640
MIN: 100039035417226403
MERS Phone: 1-888-679-6377
PIN: 20016488
Case #: 45-45-6-3377007

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3003
Modified for VA                                                                  07/2021
EX 25281.6                                                                       Page 1 of 21



Q103541722640002020002333f9fd19dd-ab79-48b6-bc97-c1c998ffac040121

3541722640

## Parties

(A) "Borrower" is **William B. Lane and Misty S. Lane, a married couple,** currently residing at **21567 N 85th Dr, Peoria, AZ 85382 USA.** Borrower is the trustor under this Security Instrument.

(B) "Lender" is **Rocket Mortgage, LLC.** Lender is a **Limited Liability Company** organized and existing under the laws of the **State of Michigan.** Lender's mailing address is **1050 Woodward Ave, Detroit, MI 48226-1906.** The term "Lender" includes any successors and assigns of Lender.

(C) "Trustee" is **Northwest Trustee Services, Inc..** Trustee's mailing address is **P.O. Box 997, Bellevue, WA 98006.** The term "Trustee" includes any substitute/successor Trustee.

(D) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

## Documents

(E) "Note" means the promissory note dated **April 10, 2024,** and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender **Seven Hundred Fifteen Thousand And 00/100** Dollars (U.S. **$715,000.00**) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than **May 1, 2054.**

(F) "Riders" means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Other(s) [specify]
☐ 1-4 Family Rider ☒ Planned Unit Development Rider _____
☐ Second Home Rider ☒ VA Rider

(G) "Security Instrument" means this document, which is dated **April 10, 2024,** together with all Riders to this document.

## Additional Definitions

(H) "Applicable Law" means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT **Form 3003**
Modified for VA 07/2021
☒ 25281.6 *Page 2 of 21*



Q1035417226400020200233f9fd19dd-ab79-48b6-bc97-c1c998ffac040221

3541722640

association, or similar organization.

**(J) "Default"** means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).

**(K) "Electronic Fund Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

**(L) "Electronic Signature"** means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

**(M) "E-SIGN"** means the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7001 *et seq.*), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**(N) "Escrow Items"** means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

**(O) "Loan"** means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(P) "Loan Servicer"** means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

**(Q) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(R) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

**(S) "Partial Payment"** means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

**(T) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

**(U) "Property"** means the property described below under the heading "TRANSFER OF RIGHTS IN THE

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   **Form 3003**
Modified for VA   07/2021
☒ 25281.6   *Page 3 of 21*



Q103541722640002020000233f9fd19dd-ab79-48b6-bc97-c1c998ffac040321

3541722640

PROPERTY."

**(V) "Rents"** means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.

**(W) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(X) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(Y) "UETA"** means the Uniform Electronic Transactions Act, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of Maricopa:
See Exhibit "A"- Legal Description Hereto and Made a Part Hereof. Subject to Covenants of Record.
which currently has the address of 21567 N 85th Dr, Peoria, Arizona 85382-3413 ("Property Address");

TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, royalties, mineral rights, oil or gas rights or profits, water rights, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered,

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
**ARIZONA**—Single Family—Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**          **Form 3003**
**Modified for VA**                                                                                                07/2021
☒ 25281.6                                                                                          *Page 4 of 21*



Q1035417226400020200023f9fd19dd-ab79-48b6-bc97-c1c998ffac040421

3541722640

and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific Arizona state requirements to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Acceptance and Application of Payments or Proceeds.**

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3003
Modified for VA                                                            07/2021
EX 25281.6                                                                 Page 5 of 21



Q103541722640002020000233f9fd19dd-ab79-48b6-bc97-c1c998ffac040521

3541722640

follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all
outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to
late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note
and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole
discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and
the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the
delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

(c) **Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

(d) **No Change to Payment Schedule.** Any application of payments, insurance proceeds, or
Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change
the amount, of the Periodic Payments.

**3. Funds for Escrow Items.**

(a) **Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic
Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of
amounts due for all Escrow Items (the "Funds"). The amount of the Funds required to be paid each month
may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of
amounts to be paid under this Section 3.

(b) **Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless
Lender waives this obligation in writing. Lender may waive this obligation for any Escrow Item at any time.
In the event of such waiver, Borrower must pay directly, when and where payable, the amounts due for any
Escrow Items subject to the waiver. If Lender has waived the requirement to pay Lender the Funds for any or
all Escrow Items, Lender may require Borrower to provide proof of direct payment of those items within
such time period as Lender may require. Borrower's obligation to make such timely payments and to provide
proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If
Borrower is obligated to pay Escrow Items directly pursuant to a waiver, and Borrower fails to pay timely the
amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and
Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in
accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow
Items, and in such amounts, that are then required under this Section 3.

(c) **Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in
an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will
estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency,
instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in
any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time
specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii)
annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower
interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and
Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #:
1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          **Form 3003**
Modified for VA                                                                      07/2021
☒ 25281.6                                                                      *Page 6 of 21*



Q103541722640002020000233f9fd19dd-ab79-48b6-bc97-c1c998ffac040621

3541722640

required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

(d) **Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the "Required Actions"). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

(a) **Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

(b) **Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     **Form 3003**
Modified for VA                                                         07/2021
25281.6                                                                 *Page 7 of 21*



Q10354172264000202000233f9fd19dd-ab79-48b6-bc97-c1c998ffac040721

3541722640

notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(c) **Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee.

(d) **Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

(e) **Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Modified for VA
☒ 25281.6

Form 3003
07/2021
Page 8 of 21



Q10354172264000202000233f9fd19dd-ab79-48b6-bc97-c1c998ffac040821

3541722640

event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

7. Preservation, Maintenance, and Protection of the Property; Inspections. Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Lender may make reasonable entries upon and inspections of the Property. If Lender has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.

(a) Protection of Lender's Interest. If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3003
Modified for VA    07/2021
25281.6    Page 9 of 21



Q10354172264000202000233f9fd19dd-ab79-48b6-bc97-c1c998ffac040921

3541722640

proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or (iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs; (B) property inspection and valuation fees; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

(b) **Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

(c) **Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(d) **Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. Borrower will not surrender the leasehold estate and interests conveyed or terminate or cancel the ground lease. Borrower will not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

**10. Assignment of Rents.**

(a) **Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party ("*Tenant*"), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. Borrower authorizes Lender to collect the Rents, and agrees that each Tenant will pay the Rents to Lender. However, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

(b) **Notice of Default.** If Lender gives notice of Default to Borrower: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    **Form 3003**
Modified for VA    07/2021
25281.6    *Page 10 of 21*



Q1035417226400020200233f9fd19dd-ab79-48b6-bc97-c1c998ffac041021

3541722640

Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and of collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

(c) **Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

(d) **Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

(e) **No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

(f) **Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

(g) **Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

**11. Mortgage Insurance.**

(a) **Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     **Form 3003**
Modified for VA     07/2021
☒ 25281.6     Page 11 of 21



Q1035417226400020200023319fd19dd-ab79-48b6-bc97-c1c998ffac041121

3541722640

lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

(b) Mortgage Insurance Agreements. Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 U.S.C. § 4901 *et seq.*), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter ("HPA"). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**12. Assignment and Application of Miscellaneous Proceeds; Forfeiture.**

(a) Assignment of Miscellaneous Proceeds. Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

(b) Application of Miscellaneous Proceeds upon Damage to Property. If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        **Form 3003**
**Modified for VA**        07/2021
25281.6        *Page 12 of 21*



Q1035417228400020200233f9fd19dd-ab79-48b6-bc97-c1c998ffac041221

3541722640

and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

(c) **Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a "Partial Devaluation") where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

(d) **Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. "Opposing Party" means the third party that owes Borrower the Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

(e) **Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Modified for VA
☒ 25281.6

**Form 3003**
07/2021
Page 13 of 21



Q1035417226400020200023f9fd19dd-ab79-48b6-bc97-c1c998ffac041321

3541722640

will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights such as dower and curtesy and any available homestead exemptions; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**15. Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and (ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

**(b) Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection, valuation, mediation, and loss mitigation fees; and (iii) other related fees.

**(c) Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
**ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          **Form 3003**
**Modified for VA**                                                             07/2021
25281.6                                                                         *Page 14 of 21*



Q1035417226400020200023f9fd19dd-ab79-48b6-bc97-c1c998ffac041421

3541722640

by Applicable Law.

(d) **Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**16. Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

(a) **Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

(b) **Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication ("Electronic Communication") if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address ("Electronic Address"); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

(c) **Borrower's Notice Address.** The address to which Lender will send Borrower notice ("Notice Address") will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

(d) **Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      **Form 3003**
Modified for VA      07/2021
☒ 25281.6      *Page 15 of 21*



Q1035417226400020200023 3f9fd19dd-ab79-48b5-bc97-c1c998ffac041521

3541722640

Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

(e) **Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**17. Governing Law; Severability; Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of Arizona. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken.

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to "Section" in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**18. Borrower's Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3003
Modified for VA                                                                                              07/2021
GXJ  25281.6                                                                                                  Page 16 of 21



Q1035417226400020200023f9fd19dd-ab79-48b6-bc97-c1c998ffac041621

3541722640

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    **Form 3003**
Modified for VA                                                                                                                              07/2021
☒ 25281.6                                                                                                                               *Page 17 of 21*


Q10354172264000202000233f9fd19dd-ab79-48b6-bc97-c1c998ffac041721

3541722640

Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

**(a) Definitions.** As used in this Section 24: (i) "Environmental Law" means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) "Hazardous Substances" include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**(b) Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**(c) Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**25. Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower ("Borrower's Electronic Signature") instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
**ARIZONA**–Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**       **Form 3003**
**Modified for VA**                                                                                          07/2021
▨▨ 25281.6                                                                                          *Page 18 of 21*


Q1035417228400020200233f9fd19dd-ab79-48b6-bc97-c1c998ffac041821

3541722640

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.**

(a) **Notice of Default.** Lender will give a notice of Default to Borrower prior to acceleration following Borrower's Default, except that such notice of Default will not be sent when Lender exercises its right under Section 19 unless Applicable Law provides otherwise. The notice will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notice is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property; (v) Borrower's right to reinstate after acceleration; and (vi) Borrower's right to bring a court action to deny the existence of a Default or to assert any other defense of Borrower to acceleration and sale.

(b) **Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notice, Lender may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument unless prohibited by Applicable Law.

(c) **Notice of Sale; Sale of Property.** If Lender invokes the power of sale, Lender will send written notice to Trustee of the occurrence of an event of Default and of Lender's election to cause the Property to be sold. Trustee will record a notice of sale in each county in which any part of the Property is located and will mail copies of the notice as prescribed by Applicable Law to Borrower and to the other required recipients. At a time permitted by, and in accordance with Applicable Law, Trustee, without further demand on Borrower, will sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may submit a credit bid and may purchase the Property at any sale.

(d) **Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed will be prima facie evidence of the truth of the statements made in that deed. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs; (ii) to all sums secured by this Security Instrument; and (iii) any excess to the parties legally entitled to it or to the county treasurer of the county in which the sale took place.

**27. Release.** Upon payment of all sums secured by this Security Instrument, Lender will release this Security Instrument. Borrower will pay any recordation costs associated with such release. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**28. Substitute Trustee.** Lender may, from time to time, by itself or through the Loan Servicer,

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Modified for VA
☒ 25281.6

Form 3003
07/2021
Page 19 of 21



Q103541722640002022000233f9fd19dd-ab79-48b5-bc97-c1c998ffac041921

3541722640

remove Trustee and appoint a successor trustee to any Trustee appointed under this Security Instrument. Without conveyance of the Property, the successor trustee will succeed to all the rights, title, power, and duties conferred upon Trustee in this Security Instrument and by Applicable Law.

**29. Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

**30. Attorneys' and Others' Fees.** Lender will be entitled to recover its reasonable attorneys' fees and costs and any other fees and costs associated with the enforcement of this Security Instrument, including but not limited to, foreclosure trustee and sheriff's fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument unless prohibited or restricted by Applicable Law. The term "attorneys' fees," whenever used in this Security Instrument, includes without limitation, attorneys' fees incurred by Lender in any bankruptcy or appellate proceeding.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

_william - b. lane_   04/10/2024
- BORROWER - William B. Lane - DATE -

_Misty S. Lane_   04/10/2024
- BORROWER - Misty S. Lane - DATE -

[Space Below This Line for Acknowledgment]

State of Arizona

County of Maricopa

The foregoing instrument was acknowledged before me this April 10, 2024 by, William B. Lane, as an individual; and Misty S. Lane, as an individual.



Notary Public


ERNESTINE NATHAN
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 638682
Expires November 2, 2026

My Commission Expires:   11 - 2 - 2026

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Modified for VA
25281.6

Form 3003
07/2021
Page 20 of 21

Q10354172264000202000233f9fd19dd-ab79-48b6-bc97-c1c998ffac042021

3541722640

Individual Loan Originator: **Anthoine Wyatt**, NMLSR ID: **1510633**
Loan Originator Organization: **Rocket Mortgage, LLC**, NMLSR ID: **3030**

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #:
1045130, NMLS #: 1510633)
ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    **Form 3003**
**Modified for VA**    07/2021
ⓧⓧ 25281.6    *Page 21 of 21*


Q1035417228400020200233f9fd19dd-ab79-48b6-bc97-c1c998ffac042121

## PLANNED UNIT DEVELOPMENT RIDER

Lane
Loan #: 3541722640
MIN: 100039035417226403
Case #: 45-45-6-3377007

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **10th** day of **April, 2024**, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **Rocket Mortgage, LLC**, (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**21567 N 85th Dr, Peoria, AZ 85382-3413**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in THE COVENANTS, CONDITIONS AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE PROPERTY (the "Declaration"). The Property is a part of a planned unit development known as

**Silverton**
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits, and proceeds of Borrower's interest.

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

**MULTISTATE PUD RIDER- Single Family -Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
25439.5                                                    **Form 3150** 07/2021
                                                           *Page 1 of 3*


Q10354172264000202000265063774f4-d5b2-4b55-8ccc-975a025536bd0103

3541722640

**PUD COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower will perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument, or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower will promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance, then (i) Lender waives the provision in Section 3 for the portion of the Periodic Payment made to Lender consisting of the yearly premium installments for property insurance on the Property, and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower will give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and will be paid to Lender. Lender will apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower will take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and will be paid to Lender. Such proceeds will be applied by Lender to the sums secured by the Security Instrument as provided in Section 12.

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

**MULTISTATE PUD RIDER-** Single Family -Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
▨ 25439.5                                                                Form 3150   07/2021
Page 2 of 3



Q1035417226400020200026506377 4f4-d5b2-4b55-8ccc-975a025536bd0203

3541722640

**E. Lender's Prior Consent.** Borrower will not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents unless the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F will become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts will bear interest from the date *of disbursement at the Note rate and will be payable, with interest, upon notice from* Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

*william b. lane*  04/10/2024
- BORROWER - William B. Lane - DATE -

*Misty S. Lane*  04/10/2024
- BORROWER - Misty S. Lane - DATE -

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

MULTISTATE PUD RIDER- Single Family -Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
☒ 25439.5

Form 3150  07/2021
Page 3 of 3



Q1035417226400020200026506377f4-d5b2-4b55-8ccc-975a025536bd0303

## V.A. GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

Lane
Loan #: 3541722640
MIN: 100039035417226403
Case #: 45-45-6-3377007

THIS V.A. GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this 10th day of **April, 2024**, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to **Rocket Mortgage, LLC** (herein "Lender") and covering the property described in the Security Instrument and located at **21567 N 85th Dr, Peoria, AZ 85382-3413** (Property Address).

**V.A. GUARANTEED LOAN COVENANT:** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER
▣ 53.46    Page 1 of 3



Q1035417226400020200012B7e6c98d4-02b8-4991-8b4d-806440a76d980103

3541722640

If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof will govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 19 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

**LATE CHARGE:** At Lender's option, Borrower will pay a "late charge" not exceeding **Four** percent (**4.000%**) of the overdue installment (principal, interest, and escrow for taxes and insurance) when paid more than **Fifteen (15)** days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" will not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

**GUARANTY:** Should the Department of Veterans Affairs fail or refuse to issue its guaranty in full amount within 60 days from the date that this loan would normally become eligible for such guaranty committed upon by the Department of Veterans Affairs under the provisions of Title 38 of the U.S. Code "Veterans Benefits," the Mortgagee may declare the indebtedness hereby secured at once due and payable and may foreclose immediately or may exercise any other rights hereunder or take any other proper action as by law provided.

**TRANSFER OF THE PROPERTY:** This loan may be declared immediately due and payable upon transfer of the property securing such loan to any transferee, unless the acceptability of the assumption of the loan is established pursuant to 38 U.S.C. 3714.
An authorized transfer ("assumption") of the property will also be subject to additional covenants and agreements as set forth below:

(a) ASSUMPTION FUNDING FEE: A fee equal to one-half of one percent of the balance of this loan as of the date of transfer of the property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the VA. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729(c).

(b) ASSUMPTION PROCESSING CHARGE: Upon application for approval to allow assumption and transfer of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

**VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER**
☒ 53.46                         Page 2 of 3



Q1035417226400020200001257e6c98d4-02b8-4991-8b4d-806440a76d980203

3541722640

shall not exceed the maximum established by the VA for a loan to which 38 U.S.C. 3714 applies.

(c) <u>ASSUMPTION INDEMNITY LIABILITY:</u> If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the Veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the VA to the extent of any claim payment arising from the guaranty or insurance of the indebtedness created by this instrument.

IN WITNESS WHEREOF, Borrower(s) has executed this V.A. Guaranteed Loan and Assumption Policy Rider.



- BORROWER -  William  B.  Lane  - DATE -

- BORROWER -  Misty  S.  Lane  - DATE -

Rocket Mortgage, LLC (NMLS #: 3030) | Rocket Mortgage, LLC (NMLS #: 3030) | Anthoine Wyatt (License #: 1045130, NMLS #: 1510633)

**VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER**
53.46                              Page 3 of 3

Q103541722840002020001257e6c98d4-02b8-4991-8b4d-806440a76d980303

EXHIBIT A - LEGAL DESCRIPTION

Tax Id Number(s): 20016488

Land situated in the County of Maricopa in the State of AZ

LOT 97, OF SILVERTON, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY
RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 441 OF MAPS, PAGE 37.

Commonly known as:  21567 N 85th Dr, Peoria, AZ 85382-3413

THE PROPERTY ADDRESS AND TAX PARCEL IDENTIFICATION NUMBER LISTED ARE PROVIDED SOLELY FOR
INFORMATIONAL PURPOSES.

EXHIBIT "C"

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
20240477565   09/09/2024   10:39
ELECTRONIC RECORDING

7935069-1-1-1--
crocfers

WHEN RECORDED MAIL TO: **FIRST AMERICAN MORTGAGE SOLUTIONS**
**FIRST AMERICAN MORTGAGE SOLUTIONS**
**1795 INTERNATIONAL WAY**
**IDAHO FALLS, ID 83402**
PH. **208-528-9895**
**ARIZONA**
COUNTY OF **MARICOPA**
LOAN NO.: **3541722640**

## ASSIGNMENT OF DEED OF TRUST

FOR THE VALUE RECEIVED, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS BENEFICIARY, AS NOMINEE FOR ROCKET MORTGAGE, LLC, ITS SUCCESSORS AND ASSIGNS**, located at **P.O. BOX 2026, FLINT, MICHIGAN 48501-2026**, Assignor, does hereby grant, assign, and transfer without recourse, representation or warranty, expressed or implied to **ROCKET MORTGAGE, LLC, FKA QUICKEN LOANS, LLC**, located at **1050 WOODWARD AVE, DETROIT, MI 48226**, Assignee, its successors and assigns, all its rights, title and interest in and to that certain Deed of Trust described below.

Said Deed of Trust dated **APRIL 10, 2024**, executed by **WILLIAM B. LANE AND MISTY S. LANE, A MARRIED COUPLE**, Trustor, to **NORTHWEST TRUSTEE SERVICES, INC.**, Original Trustee, for the benefit of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS BENEFICIARY, AS NOMINEE FOR ROCKET MORTGAGE, LLC, ITS SUCCESSORS AND ASSIGNS**, Original Beneficiary, and recorded on **APRIL 15, 2024** as Instrument No. **20240192846** in the office of the County Recorder of **MARICOPA** County, State of **ARIZONA** and more particularly described in said Deed of Trust referred to herein.

TOGETHER WITH all rights accrued or to accrue under said Deed of Trust.

IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on **SEPTEMBER 05, 2024.**

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS BENEFICIARY, AS NOMINEE FOR ROCKET MORTGAGE, LLC, ITS SUCCESSORS AND ASSIGNS**

AMY COLVIN, VICE PRESIDENT

STATE OF **IDAHO** COUNTY OF **BONNEVILLE** ) ss.

On **SEPTEMBER 05, 2024**, before me, **KATIE OLSON**, personally appeared **AMY COLVIN** known to me to be the **VICE PRESIDENT** of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS BENEFICIARY, AS NOMINEE FOR ROCKET MORTGAGE, LLC, ITS SUCCESSORS AND ASSIGNS** the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

**KATIE OLSON (COMM. EXP. 02/26/2027)**
NOTARY PUBLIC

KATIE OLSON
Notary Public - State of Idaho
Commission Number 20210709
My Commission Expires Feb 26, 2027

QL8040120IM - AM - AZ

Page 1 of 1

MIN: 100039035417226403

MERS PHONE: 1-888-679-6377

# EXHIBIT "D"



# Procedures Manual

Release 19.0
June 14, 2010

# Transfer of Beneficial Rights to Member Investors

## Overview

Although MERS tracks changes in ownership of the beneficial rights for loans registered on the MERS® System, MERS cannot transfer the beneficial rights to the debt. The debt can only be transferred by properly endorsing the promissory note to the transferee. As a MERS Member you have two options for registering a transfer of beneficial rights to another Member: Option 1 and Option 2. The determination of whether Option 1 or Option 2 is used is based on the Membership Profile of the purchasing investor.

### Option 1

An Option 1 transfer can be created in either flat file/EDI X12 mode or online.

In an Option 1 transfer, the Investor transfers beneficial rights on a system other than MERS (example: MORNET) and that system then initiates the MERS transaction.

Loans in an Option 1 batch that have not been registered are automatically reprocessed ("cycled") until the loans have been registered, up to ten (10) calendar days from the Transfer Date. Option 1 investors receive notification when MIN cycling begins through the *Transfer of Beneficial Rights Reject Report.*

If you include MINs that are not registered in your agency transmission (e.g. MORNET), you will receive an abbreviated version of the *Transfer of Beneficial Rights Reject Report* listing these unregistered MINs. It is your responsibility to register these MINs immediately, entering your MERS Org ID in the Investor field. If you register them after the 10 day cycling process is over, you must name the Agency in the Investor field.

An Option 1 Transfer of Beneficial Rights will replace any Option 2 investor on the loan. The investor that was removed during the Option 1 process is notified of its removal by the *Investor Removed by Option 1 TOB report.* Additionally, Interim Funder and Warehouse Gestation Lender interests are released automatically in an Option 1 beneficial rights transfer. No confirmations are required for Option 1 transfers.



**TERMS AND CONDITIONS**

1.  MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request.   The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.

2.  The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. **MERS agrees not to assert any rights** (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.

3.  MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes. In the absence of contrary instructions from the note holder, MERS shall comply with instructions from the Servicer shown on the MERS® System in accordance with the Rules and Procedures of MERS.

4.  No rights or obligations of the Member with respect to any data or information supplied to MERS by or on behalf of the Member shall be altered or affected in any manner by the provision of such data or information to MERS (except as otherwise specifically provided in these Terms and Conditions or the Rules of Membership).

5.  If the Member uses MERS as Original Mortgagee (MOM) on the security instrument, the loan must be registered on the MERS® System within 10 days of the Note Date.

6.  **MERS and the Member agree that:  (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans,** (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System.

7.  If the Member has a third-party register loans (the "Registrar") on the MERS® System on behalf of the Member, the Registrar shall not be deemed an agent of MERS.  The Registrar shall be solely an agent for the Member, and MERS is only giving consent to the Member to use a Registrar to enter information on the MERS® System on behalf of the Member.  The Member agrees that MERS is not liable to the Member for any errors and omissions, negligence, breach of confidentiality, breach of the Rules and Procedures, or willful misconduct of the Registrar, or any employee, director, officer, agent or affiliate of the Registrar in performing its services to the Member.

8.  The Member shall promptly pay to MERS the compensation due it for transactions registered on the MERS® System and other services rendered to the Member based on the then current MERS fee schedules, which may change from time to time.  The Member shall promptly pay to MERS any interest and penalties on delinquent fee payments at the rate set by MERS from time to time.  MERS shall have the authority to impose reasonable penalties and fines on Members for breach of the Governing Documents, and the Member shall promptly pay such fines in accordance with the terms of their imposition.

9.  MERS shall indemnify and hold harmless the Member, and any employee, director, officer, agent or affiliate of the Member  ("Member Party"), from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses ("indemnified Payments") that the Member Party may sustain directly from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, breach of the Rules and Procedures, or willful misconduct of MERS, or any employee, director, officer, agent or affiliate of MERS ("MERS Indemnified Claim").  Notwithstanding the foregoing, MERS shall not be liable or responsible under the terms of this Paragraph for any losses or claims

resulting from the actions or omissions of any person other than an employee, director, officer (who is also an employee of MERS), agent or affiliate of MERS.

The Member shall indemnify and hold harmless MERS, and any employee, director, officer, agent or affiliate of MERS ("MERS Party"), for any Indemnified Payments which do not result from a MERS Indemnified Claim and which such MERS Party incurs (i) from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, Rules and Procedures, or willful misconduct of a Member Party, (ii) with respect to a transaction on the MERS® System initiated by such Member, or (iii) as a result of compliance by MERS with instructions given by the Member, or its designee, as beneficial owner, servicer or secured party shown on the MERS® System ("Member Indemnified Claim").

MERS shall promptly notify the Member if a claim is made by a third party against either MERS or the Member with respect to any mortgage loan registered on the MERS® System in which the Member is shown on the MERS® System as beneficial owner, servicer or secured party in accordance with the Rules and Procedures. The Member shall promptly notify MERS if a claim is made against the Member that may be subject to the indemnification provisions of this Paragraph.

The obligations of MERS and the Member under this Paragraph shall survive the termination of the Member's use of the MERS® System.

10. MERS and the Member shall maintain appropriate insurance coverage that shall include an errors and omissions insurance policy and a fidelity bond. MERS shall not be required to maintain coverage for persons who may be appointed at the request of the Member as certifying officers of MERS. The Member's policies shall protect and insure MERS against losses in connection with the release or satisfaction of a mortgage loan without having obtained payment in full of the indebtedness secured thereby. Upon request, MERS or the Member shall cause to be delivered to the other a certified true copy of such errors and omissions insurance policy and fidelity bond.

In the event of any loss of principal or interest on a mortgage loan or any Indemnified Payments for which reimbursement is received from a fidelity bond or any errors and omissions insurance policy or other insurance policy, the proceeds from any such bond or insurance shall be held in trust for and be promptly paid to the Member who is shown as the servicer on the MERS® System on behalf of the beneficial owner unless otherwise requested by the beneficial owner.

11. Any notice or other communication which is required or permitted to be given or made to MERS pursuant to any provision of the Governing Documents shall be given or made in writing and shall be sent by nationally recognized overnight courier, or facsimile followed by delivery of the original via first class mail, addressed as follows: MERS, Corporate Secretary, 1818 Library Street, Suite 300, Reston, Virginia, 20190.

12. These Terms and Conditions and all transactions effected by the Member with MERS shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

13. Neither the Member nor MERS shall institute a proceeding before any tribunal to resolve any controversy or claim arising out of or relating to these Terms and Conditions, Rules and Procedures, or the breach, termination or invalidity thereof (a "Dispute"), before such party has sought to resolve the Dispute through direct negotiation with the other party. If the Dispute is not resolved within thirty (30) days after a written demand for direct negotiation, the parties shall attempt to resolve the Dispute through mediation. If the parties do not promptly agree on a mediator, either party may request the then chief judge of the Circuit Court of Fairfax County, Virginia to appoint a mediator. All mediation proceedings hereunder shall be held in Washington, D.C. If the mediator is unable to facilitate a settlement of the Dispute within a reasonable period of time, as determined by the mediator, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief in accordance with the arbitration provisions of this Paragraph. The fees and expenses of the mediator shall be paid by the party initiating the Dispute.

In the event that the Member and MERS are not able to resolve a Dispute in accordance with the mediation provisions of this Paragraph, such Dispute shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof; provided, however, that the place of arbitration shall be Washington, DC, and fees and expenses for the arbitration proceedings shall be paid by the party initiating arbitration.

# EXHIBIT "E"

**Offering Circular Supplement**
**(To Base Offering Circular dated July 1, 2023)**



$1,014,231,647
**Government National Mortgage Association**
*GINNIE MAE®*

Guaranteed REMIC Pass-Through Securities
and MX Securities
Ginnie Mae REMIC Trust 2024-077

**The Securities**

*The Trust will issue the Classes of Securities listed on the front cover of this offering circular supplement.*

**The Ginnie Mae Guaranty**

*Ginnie Mae will guarantee the timely payment of principal and interest on the securities. The Ginnie Mae Guaranty is backed by the full faith and credit of the United States of America.*

**The Trust and its Assets**

*The Trust will own Ginnie Mae Certificates.*

*The securities may not be suitable investments for you. You should consider carefully the risks of investing in them.*

*See "Risk Factors" beginning on page S-10 which highlights some of these risks.*

*The Sponsor and the Co-Sponsor will offer the securities from time to time in negotiated transactions at varying prices. We expect the closing date to be May 30, 2024.*

*You should read the Base Offering Circular as well as this Supplement.*

*The securities are exempt from registration under the Securities Act of 1933 and are "exempted securities" under the Securities Exchange Act of 1934.*

| Class of REMIC Securities | Original Principal Balance(2) | Interest Rate | Principal Type(3) | Interest Type(3) | CUSIP Number | Final Distribution Date(4) |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| FA | $ 50,000,000 | (5) | PT | FLT | 38384NPH2 | May 2054 |
| SA | 50,000,000 | (5) | NTL(PT) | INV/IO | 38384NPJ8 | May 2054 |
| **Security Group 2** | | | | | | |
| FB | 45,000,000 | (5) | PT | FLT | 38384NPK5 | May 2054 |
| SB | 45,000,000 | (5) | NTL(PT) | INV/IO | 38384NPL3 | May 2054 |
| **Security Group 3** | | | | | | |
| A | 50,000,000 | 5.50% | SEQ/AD | FIX | 38384NPM1 | May 2053 |
| Z | 848,134 | 5.50 | SEQ | FIX/Z | 38384NPN9 | May 2054 |
| **Security Group 4** | | | | | | |
| FL | 100,000,000 | (5) | PT | FLT | 38384NPP4 | May 2054 |
| LV(1) | 10,294,000 | 5.50 | SEQ/AD | FIX | 38384NPQ2 | April 2036 |
| LZ(1) | 18,600,000 | 5.50 | SEQ | FIX/Z | 38384NPR0 | May 2054 |
| MA(1) | 67,894,000 | 5.50 | SEQ | FIX | 38384NPS8 | November 2049 |
| MV(1) | 2,912,000 | 5.50 | SEQ | FIX | 38384NPT6 | May 2051 |
| SL | 100,000,000 | (5) | NTL(PT) | INV/IO | 38384NPU3 | May 2054 |
| **Security Group 5** | | | | | | |
| BA | 37,000,000 | 7.50 | SEQ | FIX | 38384NPV1 | July 2053 |
| BD | 3,176,485 | 7.50 | SEQ | FIX | 38384NPW9 | April 2054 |
| CZ | 1,448,582 | 7.50 | SUP | FIX/Z | 38384NPX7 | April 2054 |
| PA | 17,697,000 | 7.50 | PAC/AD | FIX | 38384NPY5 | November 2052 |
| PZ | 816,000 | 7.50 | PAC/AD | FIX/Z | 38384NPZ2 | April 2054 |
| **Security Group 6** | | | | | | |
| FD | 50,000,000 | (5) | PT | FLT | 38384NQA6 | May 2054 |
| SD | 50,000,000 | (5) | NTL(PT) | INV/IO | 38384NQB4 | May 2054 |
| **Security Group 7** | | | | | | |
| EV(1) | 9,680,000 | 5.50 | SEQ/AD | FIX | 38384NQC2 | April 2035 |
| EZ(1) | 11,784,000 | 5.50 | SEQ | FIX/Z | 38384NQD0 | May 2054 |
| FE | 20,608,658 | (5) | PT | FLT | 38384NQE8 | May 2054 |
| NA(1) | 88,397,000 | 5.50 | SEQ | FIX | 38384NQF5 | November 2050 |
| NV(1) | 11,078,285 | 5.50 | SEQ | FIX | 38384NQG3 | March 2052 |
| SE | 20,608,658 | (5) | NTL(PT) | INV/IO | 38384NQH1 | May 2054 |
| **Security Group 8** | | | | | | |
| FG | 113,861,909 | (5) | PT | FLT | 38384NQJ7 | May 2054 |
| GA(1) | 59,705,000 | 5.50 | SEQ | FIX | 38384NQK4 | October 2051 |
| GY(1) | 7,235,000 | 5.50 | SEQ/AD | FIX | 38384NQL2 | April 2035 |
| GZ(1) | 8,917,940 | 5.50 | SEQ | FIX/Z | 38384NQM0 | May 2054 |
| SG | 113,861,909 | (5) | NTL(PT) | INV/IO | 38384NQN8 | May 2054 |
| **Security Group 9** | | | | | | |
| JJ | 80,022,000 | 5.50 | SEQ/AD | FIX | 38384NQP3 | May 2047 |
| JZ | 12,710,254 | 5.50 | SEQ | FIX/Z | 38384NQQ1 | May 2054 |
| **Security Group 10** | | | | | | |
| DA | 13,420,000 | 5.00 | SEQ/AD | FIX | 38384NQR9 | January 2050 |
| DZ | 1,185,023 | 5.00 | SEQ | FIX/Z | 38384NQS7 | January 2054 |
| **Security Group 11** | | | | | | |
| FJ | 51,138,689 | (5) | PT | FLT | 38384NQT5 | May 2054 |
| SJ | 51,138,689 | (5) | NTL(PT) | INV/IO | 38384NQU2 | May 2054 |
| **Residual** | | | | | | |
| R | 0 | 0.00 | NPR | NPR | 38384NQV0 | May 2054 |

(1) These Securities may be exchanged for MX Securities described in Schedule I to this Supplement.

(2) Subject to increase as described under "Increase in Size" in this Supplement. The amount shown for each Notional Class (indicated by "NTL" under Principal Type) is its original Class Notional Balance and does not represent principal that will be paid.

(3) As defined under "Class Types" in Appendix I to the Base Offering Circular. The Class Notional Balance of each Notional Class will be reduced as shown under "Terms Sheet — Notional Classes" in this Supplement.

(4) See "Yield, Maturity and Prepayment Considerations — Final Distribution Date" in this Supplement.

(5) See "Terms Sheet — Interest Rates" in this Supplement.

**Morgan Stanley**                              **Mischler Financial Group, Inc.**

*The date of this Offering Circular Supplement is May 23, 2024.*

## AVAILABLE INFORMATION

You should purchase the securities only if you have read and understood the following documents:

- this Offering Circular Supplement (this "Supplement") and

- the Base Offering Circular.

The Base Offering Circular is available on Ginnie Mae's website located at http://www.ginniemae.gov ("ginniemae.gov").

If you do not have access to the internet, call BNY Mellon, which will act as information agent for the Trust, at (800) 234-GNMA, to order copies of the Base Offering Circular.

Please consult the standard abbreviations of Class Types included in the Base Offering Circular as Appendix I and the glossary included in the Base Offering Circular as Appendix II for definitions of capitalized terms.

---

## TABLE OF CONTENTS

| | Page | | Page |
|---|---|---|---|
| Terms Sheet | S-3 | ERISA Matters | S-38 |
| Risk Factors | S-10 | Legal Investment Considerations | S-38 |
| The Trust Assets | S-14 | Plan of Distribution | S-39 |
| Ginnie Mae Guaranty | S-15 | Increase in Size | S-39 |
| Description of the Securities | S-15 | Legal Matters | S-39 |
| Yield, Maturity and Prepayment | | Schedule I: Available Combinations | S-I-1 |
| Considerations | S-19 | Schedule II: Scheduled Principal | |
| Certain United States Federal Income | | Balances | S-II-1 |
| Tax Consequences | S-36 | | |

## TERMS SHEET

This terms sheet contains selected information for quick reference only. You should read this Supplement, particularly "Risk Factors," and each of the other documents listed under "Available Information."

**Sponsor:**  Morgan Stanley & Co. LLC

**Co-Sponsor:**  Mischler Financial Group, Inc.

**Trustee:**  U.S. Bank National Association

**Tax Administrator:**  The Trustee

**Closing Date:**  May 30, 2024

**Distribution Date:**  The 20th day of each month or, if the 20th day is not a Business Day, the first Business Day thereafter, commencing in June 2024.

**Trust Assets:**

| Trust Asset Group | Trust Asset Type | Certificate Rate | Original Term To Maturity (in years) |
|:---:|:---|:---:|:---:|
| 1 | Ginnie Mae II | 6.500% | 30 |
| 2 | Ginnie Mae II | 7.000% | 30 |
| 3 | Ginnie Mae II | 5.500% | 30 |
| 4 | Ginnie Mae II | 6.000% | 30 |
| 5 | Ginnie Mae II | 7.500% | 30 |
| 6 | Ginnie Mae II | 6.500% | 30 |
| 7 | Ginnie Mae II | 6.500% | 30 |
| 8 | Ginnie Mae II | 7.000% | 30 |
| 9 | Ginnie Mae II | 5.500% | 30 |
| 10 | Ginnie Mae II | 5.000% | 30 |
| 11 | Ginnie Mae II | 6.500% | 30 |

**Security Groups:**  This series of Securities consists of multiple Security Groups (each, a "Group"), as shown on the front cover of this Supplement and on Schedule I to this Supplement. Payments on each Group will be based solely on payments on the Trust Asset Group with the same numerical designation.

**Assumed Characteristics of the Mortgage Loans Underlying the Group 1, 2, 3, 4, 6, 7, 8, 9 and 11 Trust Assets[1]:**

| Principal Balance | Weighted Average Remaining Term to Maturity (in months) | Weighted Average Loan Age (in months) | Weighted Average Mortgage Rate[2] |
|---|---|---|---|
| **Group 1 Trust Assets** $50,000,000 | 352 | 6 | 7.053% |
| **Group 2 Trust Assets** $45,000,000 | 352 | 5 | 7.556% |
| **Group 3 Trust Assets** $50,848,134 | 354 | 6 | 6.146% |
| **Group 4 Trust Assets** $200,000,000 | 356 | 2 | 6.586% |
| **Group 6 Trust Assets** $50,000,000 | 358 | 2 | 7.075% |
| **Group 7 Trust Assets** $201,509,141 | 352 | 3 | 7.054% |
| **Group 8 Trust Assets** $189,769,849 | 352 | 4 | 7.551% |
| **Group 9 Trust Assets** $101,732,254 | 356 | 2 | 6.098% |
| **Group 11 Trust Assets** $51,138,689 | 355 | 0 | 7.088% |

[1] As of May 1, 2024.

[2] The Mortgage Loans underlying the Group 1, 2, 3, 4, 6, 7, 8, 9 and 11 Trust Assets may bear interest at rates ranging from 0.25% to 1.50% per annum above the related Certificate Rate.

The actual remaining terms to maturity, loan ages and Mortgage Rates of many of the Mortgage Loans underlying the Group 1, 2, 3, 4, 6, 7, 8, 9 and 11 Trust Assets will differ from the weighted averages shown above, perhaps significantly. *See "The Trust Assets — The Mortgage Loans" in this Supplement.*

**Characteristics of the Mortgage Loans Underlying the Group 5 and 10 Trust Assets[1]:**

| Pool Number | Principal Balance | Weighted Average Remaining Term to Maturity (in months) | Weighted Average Loan Age (in months) | Weighted Average Mortgage Rate[2] |
|---|---|---|---|---|
| **Group 5 Trust Assets** | | | | |
| DB2182 | $24,844,047.95 | 351 | 1 | 7.828% |
| CW8496 | 6,120,505.70 | 346 | 6 | 8.133 |
| CX4346 | 3,901,522.99 | 291 | 7 | 7.816 |
| CY1366 | 2,757,308.19 | 317 | 7 | 8.070 |
| DA2120 | 2,317,306.27 | 297 | 3 | 7.870 |
| DB4696 | 1,287,081.00 | 346 | 1 | 8.217 |
| CV1196 | 549,787.07 | 344 | 9 | 8.075 |
| DA5598 | 1,095,634.77 | 352 | 1 | 8.250 |
| DA7778 | 1,005,818.11 | 356 | 4 | 7.809 |
| MA9309 | 974,431.35 | 351 | 6 | 7.932 |
| DB2180 | 13,677,608.02 | 354 | 1 | 7.809 |
| DC0376 | 1,098,906.09 | 359 | 1 | 7.868 |
| | $59,629,957.51 | | | |
| **Group 10 Trust Asset** | | | | |
| 787240 | $14,603,623.05 | 343 | 11 | 5.573% |

(1)  As of May 1, 2024.

(2)  The Mortgage Loans underlying the Group 5 and 10 Trust Assets may bear interest at rates ranging from 0.25% to 1.50% per annum above the related Certificate Rate.

The actual remaining terms to maturity, loan ages and Mortgage Rates of many of the Mortgage Loans underlying the Group 5 and 10 Trust Assets will differ from the weighted averages shown above, perhaps significantly. *See "The Trust Assets — The Mortgage Loans" in this Supplement.*

**Issuance of Securities:**  The Securities, other than the Residual Securities, will initially be issued in book-entry form through the book-entry system of the U.S. Federal Reserve Banks (the "Fedwire Book-Entry System"). The Residual Securities will be issued in fully registered, certificated form. *See "Description of the Securities — Form of Securities" in this Supplement.*

**Modification and Exchange:**  If you own exchangeable Securities you will be able, upon notice and payment of an exchange fee, to exchange them for a proportionate interest in the related Securities shown on Schedule I to this Supplement. *See "Description of the Securities — Modification and Exchange" in this Supplement.*

**Increased Minimum Denomination Classes:**  Each Class that constitutes an Interest Only Class. *See "Description of the Securities — Form of Securities" in this Supplement.*

**Interest Rates:**  The Interest Rates for the Fixed Rate Classes are shown on the front cover of this Supplement or on Schedule I to this Supplement.

The Floating Rate and Inverse Floating Rate Classes will bear interest at per annum rates based on a 30-day compounded average of the Secured Overnight Financing Rate ("SOFR") (hereinafter referred to as "30-day Average SOFR") as follows:

| Class | Interest Rate Formula(1) | Initial Interest Rate(2) | Minimum Rate | Maximum Rate | Delay (in days) | 30-day Average SOFR for Minimum Interest Rate |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| FA ............. | 30-day Average SOFR + 1.45% | 6.50000% | 1.45% | 6.50% | 0 | 0.00% |
| SA ............. | 5.05% − 30-day Average SOFR | 0.00000% | 0.00% | 5.05% | 0 | 5.05% |
| **Security Group 2** | | | | | | |
| FB ............. | 30-day Average SOFR + 1.2% | 6.52742% | 1.20% | 7.00% | 0 | 0.00% |
| SB ............. | 5.8% − 30-day Average SOFR | 0.47258% | 0.00% | 5.80% | 0 | 5.80% |
| **Security Group 4** | | | | | | |
| FL ............. | 30-day Average SOFR + 1.15% | 6.47407% | 1.15% | 6.50% | 0 | 0.00% |
| SL ............. | 5.35% − 30-day Average SOFR | 0.02593% | 0.00% | 5.35% | 0 | 5.35% |
| **Security Group 6** | | | | | | |
| FD ............. | 30-day Average SOFR + 1.35% | 6.50000% | 1.35% | 6.50% | 0 | 0.00% |
| SD ............. | 5.15% − 30-day Average SOFR | 0.00000% | 0.00% | 5.15% | 0 | 5.15% |
| **Security Group 7** | | | | | | |
| FE ............. | 30-day Average SOFR + 0.8% | 6.12374% | 0.80% | 8.00% | 0 | 0.00% |
| SE ............. | 7.2% − 30-day Average SOFR | 1.87626% | 0.00% | 7.20% | 0 | 7.20% |
| **Security Group 8** | | | | | | |
| FG ............. | 30-day Average SOFR + 0.85% | 6.17374% | 0.85% | 8.00% | 0 | 0.00% |
| SG ............. | 7.15% − 30-day Average SOFR | 1.82626% | 0.00% | 7.15% | 0 | 7.15% |
| **Security Group 11** | | | | | | |
| FJ ............. | 30-day Average SOFR + 1.15% | 6.47340% | 1.15% | 6.50% | 0 | 0.00% |
| SJ ............. | 5.35% − 30-day Average SOFR | 0.02660% | 0.00% | 5.35% | 0 | 5.35% |

(1) 30-day Average SOFR will be established as described under "Description of the Securities — Interest Distributions — Floating Rate and Inverse Floating Rate Classes" in this Supplement.

(2) The initial Interest Rate will be in effect during the first Accrual Period; the Interest Rate will adjust monthly thereafter.

**Allocation of Principal:**  On each Distribution Date for a Security Group, the following distributions will be made to the related Securities:

### SECURITY GROUP 1

The Group 1 Principal Distribution Amount will be allocated to FA, until retired

### SECURITY GROUP 2

The Group 2 Principal Distribution Amount will be allocated to FB, until retired

### SECURITY GROUP 3

The Group 3 Principal Distribution Amount and the Z Accrual Amount will be allocated, sequentially, to A and Z, in that order, until retired

### SECURITY GROUP 4

The Group 4 Principal Distribution Amount and the LZ Accrual Amount will be allocated as follows:

- The LZ Accrual Amount, sequentially, to LV and LZ, in that order, until retired

- The Group 4 Principal Distribution Amount, concurrently, as follows:

    1. 50%, sequentially, to MA, MY, LV and LZ, in that order, until retired

    2. 50% to FL, until retired

### SECURITY GROUP 5

The Group 5 Principal Distribution Amount, the CZ Accrual Amount and the PZ Accrual Amount will be allocated as follows:

- The PZ Accrual Amount, sequentially, to PA and PZ, in that order, until retired

- 32.6254335552% of the Group 5 Principal Distribution Amount and the CZ Accrual Amount, in the following order of priority:

    1. Sequentially, to PA and PZ, in that order, until reduced to their Aggregate Scheduled Principal Balance

    2. To CZ, until retired

    3. Sequentially, to PA and PZ, in that order, without regard to their Aggregate Scheduled Principal Balance, until retired

- 67.3745664448% of the Group 5 Principal Distribution Amount, sequentially, to BA and BD, in that order, until retired

### SECURITY GROUP 6

The Group 6 Principal Distribution Amount will be allocated to FD, until retired

### SECURITY GROUP 7

The Group 7 Principal Distribution Amount and the EZ Accrual Amount will be allocated as follows:

- The EZ Accrual Amount, sequentially, to EV and EZ, in that order, until retired

- The Group 7 Principal Distribution Amount, concurrently, as follows:

    1. 60.0000001985%, sequentially, to NA, NY, EV and EZ, in that order, until retired

    2. 39.9999998015% to FE, until retired

### SECURITY GROUP 8

The Group 8 Principal Distribution Amount and the GZ Accrual Amount will be allocated as follows:

- The GZ Accrual Amount, sequentially, to GV and GZ, in that order, until retired

- The Group 8 Principal Distribution Amount, concurrently, as follows:

    1. 59.9999997892% to FG, until retired

    2. 40.0000002108%, sequentially, to GA, GV and GZ, in that order, until retired

### SECURITY GROUP 9

The Group 9 Principal Distribution Amount and the JZ Accrual Amount will be allocated, sequentially, to JA and JZ, in that order, until retired

### SECURITY GROUP 10

The Group 10 Principal Distribution Amount and the DZ Accrual Amount will be allocated, sequentially, to DA and DZ, in that order, until retired

### SECURITY GROUP 11

The Group 11 Principal Distribution Amount will be allocated to FJ, until retired

**Scheduled Principal Balances:**  The Aggregate Scheduled Principal Balances for the Classes listed below are included in Schedule II to this Supplement. They were calculated using among other things the following Structuring Range:

| Security Group | | Structuring Range |
|---|---|---|
| | **PAC Classes** | |
| 5 | PA and PZ (in the aggregate) .................... | 390% PSA through 500% PSA |

**Accrual Classes:**  Interest will accrue on each Accrual Class identified on the front cover of this Supplement at the per annum rate set forth on that page. However, no interest will be distributed to the Accrual Classes as interest. Interest so accrued on each Accrual Class on each Distribution Date will constitute an Accrual Amount, which will be added to the Class Principal Balance of that Class on each Distribution Date and will be distributable as principal as set forth in this Terms Sheet under "Allocation of Principal."

**Notional Classes:**  The Notional Classes will not receive distributions of principal but have Class Notional Balances for convenience in describing their entitlements to interest. The Class Notional Balance of each Notional Class represents the percentage indicated below of, and reduces to that extent with, the Class Principal Balances indicated:

| Class | Original Class Notional Balance | Represents Approximately |
|---|---|---|
| **Security Group 1** | | |
| SA .............. | $ 50,000,000 | 100% of FA (PT Class) |
| **Security Group 2** | | |
| SB .............. | $ 45,000,000 | 100% of FB (PT Class) |
| **Security Group 4** | | |
| LI ............... | $ 19,276,500 | 25% of MA and MY (in the aggregate) (SEQ Classes) |
| MI .............. | 16,973,500 | 25% of MA (SEQ Class) |
| SL ............... | 100,000,000 | 100% of FL (PT Class) |

| Class | Original Class Notional Balance | Represents Approximately |
|---|---|---|
| **Security Group 6** | | |
| SD . . . . . . . . . . . . . . | $ 50,000,000 | 100% of FD (PT Class) |
| **Security Group 7** | | |
| EI . . . . . . . . . . . . . . . | $ 22,955,881 | 23.0769230769% of NA and NY (in the aggregate) (SEQ Classes) |
| NI . . . . . . . . . . . . . . . | 20,399,307 | 23.0769230769% of NA (SEQ Class) |
| SE . . . . . . . . . . . . . . | 80,603,656 | 100% of FE (PT Class) |
| **Security Group 8** | | |
| GI . . . . . . . . . . . . . . . | $ 12,793,928 | 21.4285714286% of GA (SEQ Class) |
| SG . . . . . . . . . . . . . | 113,861,909 | 100% of FG (PT Class) |
| **Security Group 11** | | |
| SJ . . . . . . . . . . . . . . | $ 51,138,689 | 100% of FJ (PT Class) |

**Tax Status:**   Single REMIC Series. *See "Certain United States Federal Income Tax Consequences" in this Supplement and in the Base Offering Circular.*

**Regular and Residual Classes:**   Class R is a Residual Class and represents the Residual Interest of the Trust REMIC. All other Classes of REMIC Securities are Regular Classes.

# EXHIBIT "G"

Search Results – August 26, 2025

William B. Lane and Misty S. Lane

$715,000.00

Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077

Abbreviated Name - GNMA 2024-077

Closing Date – May 30, 2024

Portal - Ginnie Mae Enterprise Online Portal

Trustee – U.S. Bank National Association

Guarantor – The Government National Mortgage Association

GROUP 4

CUSIP 38384NPP4


4|882705128|N|3541722640|RETAIL|ROCKET MORTGAGE LLC|ROCKET MORTGAGE LLC |6.490|6.490|6.875|000715000.00|000715000.00|360|06/2024|000|360|05/2054|95|95|689||NO| PURCHASE|SF| AZ|85382|PUD|FIXED||NO|4514.59|P|45-45-6-3377007||GINNIE MAE REMIC TRUST 2024-077

# Trust Information – GSE

## Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077

Borrower – William B. Lane and Misty S. Lane

Date of Signing – April 10, 2024

Loan number – 3541722640

Property address – 21567 N. 85th Dr, Peoria, AZ 85382

County – Maricopa

Lender – Rocket Mortgage, LLC

Amount – $715,000.00

MERS – Yes 100039035417226403

Covenant 16 – Yes, but 17

Covenant 20 – Yes, But 21

Trustee – Ginnie Mae

Trust name – Guaranteed REMIC Pass-Through Securities and MX Securities Ginnie Mae REMIC Trust 2024-077

Abbreviated name – GNMA 2024-077

Trust Closing Date of May 30, 2024

## RELEVANT DOCS

Promissory Note of William B. Lane and Misty S. Lane dated April 10, 2024, regarding a loan for $715,000.00. The Original Lender of the April 10, 2024 Lane loan is Rocket Mortgage, LLC. The signed Note is Not Indorsed:

Deed of Trust of William B. Lane and Misty S. Lane dated April 10, 2024 and filed in the Official Records of the Maricopa County Recorder's Office on April 15, 2024 as ins# 20240192846.

"Assignment of Deed of Trust", dated September 05, 2024 and filed in the Official Records of the Maricopa County Recorder's Office on September 09, 2024 as ins# 20240477565, signed by Amy Colvin as Vice President for Mortgage Electronic Registration Systems, Inc., and notarized September 05, 2024 by Katie Olson, Idaho Notary Commission #20210709, where Mortgage Electronic Registration Systems, Inc., grants, assigns, and transfers to Rocket Mortgage, LLC, FKA Quicken Loans, LLC

## Recordation/Assignment Statutes – UCC 3-203 – UCC 7-501

*A.R.S. § 33-411. Recording real estate documents; indemnification by transferor*
*Any document evidencing the sale, or other transfer of real estate or any legal or equitable interest therein, eases, shall be recorded by the transferor in the county in which the property is located and within sixty days of the transfer. In lieu thereof, the transferor shall indemnify the transferee in any action in which the transferee's interest in such property is at issue, including costs, attorney's fees and punitive damages.*

*ERIR STATUTES SEE BELOW*

*A.R.S. § 47-3301. "Person entitled to enforce" an instrument means the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to § 47-3309 or § 47-3418, subsection D*

*A.R.S. § 47-3302. Holder in due course.*

*A. Subject to subsection C of this section and § 47-3106, subsection D, "holder in due course" means the holder of an instrument if: 1. The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and 2. The holder took the instrument: (a) For value; (b) In good faith; (c) Without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series; (d) Without notice that the instrument contains an unauthorized signature or has been altered; (e) Without notice of any claim to the instrument described in § 47-3306; and (f) Without notice that any party has a defense or claim in recoupment described in § 47-3305, subsection A.*

*A.R.S. § 47-3305. "... An obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have rights of a holder in due course and the obligor proves that the instrument is a lost or stolen instrument.*

*A.R.S. § 47-3501. Presentment.*
*A. "Presentment" means a demand made by or on behalf of a person entitled to enforce an instrument: 1. To pay the instrument made to the drawee or a party obliged to pay the instrument or, in the case of a note or accepted draft payable at a bank, to the bank; ...2. Upon demand of the person to whom presentment is made, the person making presentment must: (a) Exhibit the instrument; (b) Give reasonable identification and, if presentment is made on behalf of another person, reasonable evidence of authority to do so; and (c) Sign a receipt on the instrument for any payment made or surrender the instrument if full payment is made. 3. Without dishonoring the instrument, the party to whom presentment is made may: (a) Return the instrument for lack of a necessary indorsement; or (b) Refuse payment or acceptance for failure of the presentment to comply with the terms of the instrument, an agreement of the parties or other applicable law or rule.*

**ERIR STATUTES SEE ABOVE**

*Conveyance*
*Arizona Revised Statutes Annotated*
  *Title 11. Counties*
  *Chapter 3. County Officers*
  *Article 3. Recorder*

*...Under Arizona law, recording of deed of trust is complete when it has been received by the county recorder and stamped with its sequential document number/ record locator; indexing is not essential to the recording....*
*... In addition the recorder, under this option, shall maintain at least the following additional categories: powers of attorney, official bonds, executions, lis pendens, mine location notices and partnerships....*

*A.R.S. § 47-3203. Transfer of instrument; rights acquired by transfer*

*A. An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.*

*B. Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.*

*C. Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of indorsement by the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor, but negotiation of the instrument does not occur until the indorsement is made.*

*D. If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur. The transferee obtains no rights under this chapter and has only the rights of a partial assignee.*

*A.R.S. § 47-3205. Special indorsement; blank indorsement; anomalous indorsement*

*B. If an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a "blank indorsement". When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed.*

*C. The holder may convert a blank indorsement that consists only of a signature into a special indorsement by writing, above the signature of the indorser, words identifying the person to whom the instrument is made payable.*

*D. "Anomalous indorsement" means an indorsement made by a person who is not the holder of the instrument. An anomalous indorsement does not affect the manner in which the instrument may be negotiated.*

*A.R.S. § 47-7501. Form of negotiation and requirements of due negotiation*

*A. The following rules apply to a negotiable tangible document of title:*

*1. If the document's original terms run to the order of a named person, **the document is negotiated by the named person's indorsement and delivery**...* (emphasis added)

*A.R.S. § 47-3110. Identification of person to whom instrument is payable*

*A. **The person to whom an instrument is initially payable is determined by the intent of the person**, whether or not authorized, signing as, or in the name or behalf of, the issuer of the instrument. The instrument is payable to the person intended by the signer even if that person is identified in the instrument by a name or other identification that is not that of the intended person. If more than one person signs in the name or behalf of the issuer of an instrument and all the signers do not intend the same person as payee, the instrument is payable to any person intended by one or more of the signers.* (emphasis added)

A.R.S. § 47-3115. Incomplete instrument

A. "Incomplete instrument" means a signed writing, whether or not issued by the signer, **the contents of which show at the time of signing that it is incomplete but that the signer intended it to be completed by the addition of words or numbers.** (emphasis added)

A.R.S. § 47-9102. Definitions and index of definitions

A. In this chapter, unless the context otherwise requires:

3. "Account debtor" means a person obligated on an account, chattel paper or general intangible **but does not include persons obligated to pay a negotiable instrument**, even if the instrument constitutes part of chattel paper. (emphasis added)

A.R.S. § 47-9109. Scope

D. This chapter does not apply to:

11. The creation or transfer of an interest in or lien on real property, including a lease or rents thereunder, except to the extent that provision is made for:

(a) Liens on real property in §§ 47-9203 and 47-9308;

(b) Fixtures in § 47-9334;

(c) Fixture filings in §§ 47-9501, 47-9502, 47-9512, 47-9516 and 47-9519; and

(d) Security agreements covering personal and real property in § 47-9604; (emphasis added)

A.R.S. § 47-8102. Definitions

A. In this chapter, unless the context otherwise requires: 1. "Adverse claim" means a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer or deal with the financial asset. 2. "Bearer form", as applied to a certificated security, means a form in which the security is payable to the bearer of the security certificate according to its terms but not by reason of an indorsement. 3. "Broker" means a person defined as a broker or dealer under the federal securities laws, but without excluding a bank acting in that capacity. 4. "Certificated security" means a security that is represented by a certificate. 5. "Clearing corporation" means: (a) A person that is registered as a "clearing agency" under the federal securities laws; (b) A federal reserve bank; or (c) Any other person that provides clearance or settlement services with respect to financial assets that would require it to register as a clearing agency under the federal securities laws but for an exclusion or exemption from the registration requirement, if its activities as a clearing corporation, including promulgation of rules, are subject to regulation by a federal or state governmental authority. 6. "Communicate" means to: (a) Send a signed writing; or (b) Transmit information by any mechanism agreed upon by the persons transmitting and receiving the information. 7. "Entitlement holder" means a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary. If a person acquires a security entitlement by virtue of § 47-8501, subsection B, paragraph 2 or 3, that person is the entitlement holder. 8. "Entitlement order" means a notification communicated to a securities

intermediary directing transfer or redemption of a financial asset to which the entitlement holder has a security entitlement. 9. "Financial asset", except as otherwise provided in § 47-8103, means: (a) A security; (b) An obligation of a person or a share, participation or other interest in a person or in property or an enterprise of a person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or (c) Any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under this chapter. As the context requires, the term means either the interest itself or the means by which a person's claim to it is evidenced, including a certificated or uncertificated security, a security certificate or a security entitlement. 10. "Good faith", for purposes of the obligation of good faith in the performance or enforcement of contracts or duties within this chapter, means honesty in fact and the observance of reasonable commercial standards of fair dealing. 11. "Indorsement" means a signature that alone or accompanied by other words is made on a security certificate in registered form or on a separate document for the purpose of assigning, transferring or redeeming the security or granting a power to assign, transfer or redeem it. 12. "Instruction" means a notification communicated to the issuer of an uncertificated security which directs that the transfer of the security be registered or that the security be redeemed. 13. "Registered form", as applied to a certificated security, means a form in which: (a) The security certificate specifies a person entitled to the security; and (b) A transfer of the security may be registered upon books maintained for that purpose by or on behalf of the issuer, or the security certificate so states. 14. "Securities intermediary" means: (a) A clearing corporation; or (b) A person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity. 15. "Security", except as otherwise provided in § 47-8103, means an obligation of an issuer or a share, participation or other interest in an issuer or in property or an enterprise of an issuer: (a) Which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; (b) Which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations; and (c) Which: (i) Is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (ii) Is a medium for investment and by its terms expressly provides that it is a security governed by this chapter. 16. "Security certificate" means a certificate representing a security. 17. "Security entitlement" means the rights and property interest of an entitlement holder with respect to a financial asset specified in article 5 of this chapter. 18. "Uncertificated security" means a security that is not represented by a certificate. B. Other definitions applying to this chapter and the sections in which they appear are: 1. "Appropriate person". Section 47-8107. 2. "Control". Section 47-8106. 3. "Delivery". Section 47-8301. 4. "Investment company security". Section 47-8103. 5. "Issuer". Section 47-8201. 6. "Overissue". Section 47-8210. 7. "Protected purchaser". Section 47-8303. 8. "Securities account". Section 47-8501. C. In addition, chapter 1 of this title1 contains general definitions and principles of construction and interpretation applicable throughout this chapter. D. The characterization of a person, business or transaction for purposes of this chapter does not determine the characterization of the person, business or transaction for purposes of any other law, regulation or rule.